CONNECTICUT LIGHT AND POWER COMPANY *v.*
BESS P. GILMORE ET AL.
(AC 24700)

Schaller, Flynn and Gruendel, Js.

Argued February 9—officially released May 24, 2005

*Douglas G. Gilmore,* for the appellants (defendants).

*Jeanine M. Dumont,* with whom, on the brief, was *Corinne D. Brophy,* for the appellee (plaintiff).

*Opinion*

GRUENDEL, J. The defendants Bess P. Gilmore, Keith P. Gilmore and Douglas G. Gilmore[1] appeal from the prejudgment remedy order of the trial court author-

---

[1] Community Club Awards, Inc., also was a defendant at trial. Because only the Gilmores have appealed, we refer to them in this opinion as the defendants.

izing an attachment in the amount of $22,993.18[2] in favor of the plaintiff, the Connecticut Light and Power Company. On appeal, the defendants claim that (1) the court did not have the authority to issue a prejudgment remedy order authorizing an attachment in an amount less than the amount sought by the plaintiff in its application for prejudgment remedy, (2) if the court did have the authority to issue a prejudgment remedy order authorizing an attachment in an amount less than that sought by the plaintiff in its application for prejudgment remedy, the evidence presented did not support the court's decision to grant a prejudgment remedy order authorizing an attachment in the amount of $22,993.18, and (3) the court improperly included in the prejudgment remedy order Keith Gilmore and Douglas Gilmore as persons whose interests were subject to attachment by the plaintiff. We affirm in part and reverse in part the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of the defendants' appeal. Bess Gilmore resides at and owns 11 Harding Lane in Westport. At all relevant times, she has held an account with the plaintiff for utility services provided to 11 Harding Lane. Her two adult sons, Keith Gilmore and Douglas Gilmore, also reside there and are alleged by the plaintiff to have enjoyed the benefit of the plaintiff's services provided to that address. Community Club Awards, Inc., and Douglas Gilmore's law practice also use 11 Harding Lane as their business address.

On May 28, 2003, the plaintiff filed an application for prejudgment remedy against the defendants, seeking to

---

[2] At the conclusion of the prejudgment remedy hearing in this case, the court orally granted a prejudgment remedy authorizing an attachment in the amount of $22,993.18. The subsequent written order and writ authorized, however, an attachment in the amount of $22,933.18, or $60 less than the amount ordered orally by the court. The difference is due to a typographical error.

attach, to the value of $25,900, the real property of Bess Gilmore and the interest of each defendant in such additional real or personal property as might be identified later.[3] Accompanying the application for prejudgment remedy was an affidavit by Diane H. Brown, a credit and collections supervisor at the plaintiff's Berlin office. In that affidavit, Brown averred, among other things, that the plaintiff furnished utility services to 11 Harding Lane and that as of May 22, 2003, $21,375.38 was due and owing for services rendered. Also accompanying the application for prejudgment remedy was the plaintiff's proposed complaint. In the first count, the plaintiff alleged that Bess Gilmore, by virtue of an implied contract, owed the plaintiff $14,258.66 for utility services supplied to her residence between November 23, 1999, and May 22, 2003. In the second count, under a theory of unjust enrichment, the plaintiff alleged that all three defendants were liable for $21,375.38 worth of utility services supplied to the "defendants' premises at 11 Harding Lane" from on or about September 4, 1992, to May 22, 2003.

As permitted by General Statutes § 52-278c (g),[4] the defendants filed a motion requesting a hearing to con-

---

[3] In connection with the prejudgment remedy application and pursuant to General Statutes § 52-278n, the plaintiff filed motions seeking disclosure of each defendant's assets.

[4] General Statutes § 52-278c (g) provides: "A defendant may request a hearing to contest the application for a prejudgment remedy, assert any exemption or make a request concerning the posting or substitution of a bond. *The hearing may be requested by any proper motion* or by return to the Superior Court of a signed claim form that indicates, by the checking of the appropriate box on the claim form, whether the claim is an assertion of a defense, counterclaim, set-off or exemption, an assertion that any judgment that may be rendered is adequately secured by insurance, an assertion that the amount sought in the application for the prejudgment remedy is unreasonably high, a request that the plaintiff be required to post a bond to secure the defendant against any damages that may result from the prejudgment remedy or a request that the defendant be allowed to substitute a bond for the prejudgment remedy." (Emphasis added.)

test the plaintiff's application for a prejudgment remedy. Along with that motion, the defendants filed a memorandum of law in opposition to the plaintiff's application for prejudgment remedy and various supporting exhibits.[5]

On September 29, 2003, the court held a hearing on the plaintiff's application for prejudgment remedy. At the hearing, Thomas Murphy, supervisor for the plaintiff's credit and collections department, testified that "[t]he account at 11 Harding Lane, the Gilmore residence, [had] a very large delinquent balance." He testified that Bess Gilmore had complained about inaccurate

---

[5] In those documents, the defendants generally (1) questioned the accuracy of the plaintiff's bills to Bess Gilmore, (2) argued that a prejudgment remedy could not be issued against Douglas Gilmore and Keith Gilmore because only the customer, Bess Gilmore, not her adult children residing with her, could be liable for payment of utility services and (3) argued that the court could not issue an order authorizing an attachment against Bess Gilmore because the plaintiff did not provide, pursuant to General Statutes § 52-278c (a) (2), "[a]n affidavit . . . setting forth a statement of facts sufficient to show that there [was] probable cause that a judgment *in the amount of the prejudgment sought, or in an amount greater than the amount of the prejudgment remedy sought*, taking into account any known defenses, counterclaims or set-offs, [would] be rendered in the matter in favor of the plaintiff . . . ." (Emphasis added.)

The defendants pointed out that the plaintiff sought $25,900 in its application for prejudgment remedy, but provided the court with documents alleging liability only for amounts *less than* $25,900. As mentioned, Brown's affidavit alleged liability for $21,375.38 worth of utility services. In the first count of its proposed complaint, the plaintiff alleged liability for $14,258.66 worth of utility services, and in count two, the plaintiff alleged liability for $21,375.38 worth of utility services. As such, the defendants argued that because all of the plaintiff's supporting documents evidenced, at best, liability for an amount less than the amount sought in the application for prejudgment remedy, $25,900, and because General Statutes § 52-278d (a) (1) limits prejudgment remedy hearings in relevant part to a determination of "whether or not there is probable cause that a judgment *in the amount of the prejudgment remedy sought, or in an amount greater than the amount . . . sought* . . . will be rendered in the matter in favor of the plaintiff," the court could not entertain granting an order that authorized an attachment in the amount of $25,900, nor could it actually grant an order authorizing an attachment for an amount less than that sought in the application for prejudgment remedy. (Emphasis added.)

billing in the past, but that representatives of the plaintiff, after conducting both a walk-through of the residence and a meter test in August, 1999, determined the billing to be accurate. When asked about the representatives' inability to account for one third of the electrical usage, Murphy also testified that, not knowing to what extent the defendants use certain appliances, it would be impossible to account for all of the electrical usage and that "it [did] not surprise [him] that they couldn't account for a third." Murphy testified that Bess Gilmore disputed the representatives' findings and requested that a review officer be appointed to the case. According to Murphy, after the appointed review officer conducted her own audit, which included a walk-through, a review of all the appliances and a meter test, she concluded that the billing was correct. Murphy then testified that Bess Gilmore disputed the review officer's findings and requested a formal hearing by the department of public utility control (department). Murphy testified that in December, 2001, he and an engineer from the department conducted another walk-through and another meter test and that during the inspection he observed that the house was very large, about 5000 square feet in his estimation,[6] that it had an in-ground swimming pool and that it contained office equipment, broadcasting equipment and a lot of appliances, including three air conditioning units and a number of televisions. He also testified that "[t]here was a secretary on board [at Douglas Gilmore's law office within the house]." When asked at the hearing if there was a balance then due and owing on the account for 11 Harding Lane, Murphy

---

[6] In a September 6, 2000 letter to Bess Gilmore, Joyce H. Burdick, the review officer appointed to the case, noted that Bess Gilmore's home at 11 Harding Lane was approximately 3700 square feet. In Bess Gilmore's affidavit that accompanied the defendants' motion for a hearing on the plaintiff's application for prejudgment remedy and in her testimony at the prejudgment remedy hearing, she stated that the total living area of her home consisted of 5616 square feet, which included twelve rooms and a finished basement.

responded that there was $22,993.18 due and owing. Following that testimony, the plaintiff's counsel then introduced into evidence a billing history of Bess Gilmore's utility account. It indicated that as of September 23, 2003, approximately seven days before the date of the hearing, $22,993.18 was due and owing on the account. Finally, in response to the court's inquiry as to whether Bess Gilmore's average monthly bill was unusual, Murphy testified that "based on the stuff that's in the house, [he didn't] think that [it was] unusual."

To contest the plaintiff's application for prejudgment remedy, the defendants offered only the testimony of Bess Gilmore. The thrust of her testimony was that the plaintiff had overcharged her for the utility services that it provided to 11 Harding Lane at all relevant times. In support thereof, she testified that she and her sons "use very little electricity, keep all the lights off upstairs . . . don't use the pool [and use] some of the rooms . . . just for storage . . . ." She also testified that the broadcasting equipment of which Murphy spoke had not been used for approximately thirty years, that the plaintiff's representatives who came in August, 1999, could not account for one third of the electrical use and that she would be filing a counterclaim against the plaintiff because, according to her, "they owe[d] [her] a great deal of money." She also acknowledged, however, that she did not have any knowledge of meters and of electricity outside the general knowledge of an average person and that she did not know how much the plaintiff purportedly owed her.

At the conclusion of the hearing, the court ruled: "The issue before the court is very simple. This is a prejudgment remedy hearing, not a trial on the merits. The who, what, when, wheres and why of the electricity at 11 Harding Lane in Westport are not before the court. And the court can only consider relevant evidence at a prejudgment remedy hearing—relevant, admissible

evidence. The most telling statement of the entire hearing was by attorney [Douglas] Gilmore in support of an objection during cross-examination and in his closing argument. Mrs. Gilmore is not an expert in electricity. There's probable cause to sustain the validity of the claim."[7] The court then orally ordered a prejudgment remedy in the amount of $22,993.18. The defendants' counsel subsequently inquired whether there would be additional findings of fact. The court replied that there would not be and instructed counsel to file a written motion if the defendants wanted such additional findings. The defendants never filed such a written motion. Soon after the hearing, the court issued a written prejudgment remedy order authorizing an attachment in the amount of $22,933.18.[8]

## I

The defendants claim[9] that the court did not have the authority to issue a prejudgment remedy order authoriz-

---

[7] The court's subsequent written order stated with more specificity: "[I]t is found that there is probable cause that a judgment in the amount of the prejudgment remedy sought or in [an] amount greater than the amount of the prejudgment remedy sought, taking into account any known defenses, counterclaims or setoffs, will be rendered in the matter in favor of the plaintiff."

[8] See footnote 2.

[9] Before we address each claim in turn, we note, as a preliminary matter, that the court did not issue a written memorandum of decision or *signed* transcript setting forth its reasons for its decision on the plaintiff's application for prejudgment remedy. See Practice Book § 64-1. In such circumstances, this court frequently has declined to review the claims on appeal because the appellant has failed to provide the court with an adequate record for review. See, e.g., *Chase Manhattan Bank/City Trust* v. *AECO Elevator Co.*, 48 Conn. App. 605, 607–608, 710 A.2d 190 (1998). We conclude, however, that the unsigned transcript from the hearing, which is on file in the appellate clerk's office, adequately reveals the basis of the trial court's decisions. As such, we choose to review the claims raised by the defendants. See *Tisdale* v. *Riverside Cemetery Assn.*, 78 Conn. App. 250, 254 n.5, 826 A.2d 232, cert. denied, 266 Conn. 909, 832 A.2d 74 (2003).

We also note that with respect to any issues raised in this appeal that present purely questions of law warranting plenary review, we may review them despite the absence of a memorandum of decision or a *signed* transcript because the legal analysis undertaken by the trial court is not essential

ing an attachment for an amount less than the amount sought by the plaintiff in its application for prejudgment remedy. In support thereof, the defendants argue that General Statutes § 52-278d (a) does not permit a court to do so and that it limits a court to granting a prejudgment remedy order that authorizes an attachment in an amount *equal to or greater than* the amount sought in the application for prejudgment remedy. In the event that this court disagrees with that interpretation of § 52-278d (a), the defendants argue, alternatively, (1) that before the court could issue a prejudgment remedy order authorizing an attachment for an amount less than the amount sought in the application for prejudgment remedy, $22,993.18 and $25,900, respectively, in this case, § 52-278d (a) required the court to first determine that probable cause existed that a judgment in at least the amount sought in the application for prejudgment remedy, $25,900, would be rendered in the matter in favor of the plaintiff and (2) that there was insufficient evidence to establish probable cause that a judgment in the amount of $25,900 would be rendered in the plaintiff's favor.

"Issues of statutory construction present questions of law, over which we exercise plenary review. . . . When construing a statute, we first look to its text, as directed by Public Acts 2003, No. 03-154, § 1 (P.A. 03-154) [now General Statutes § 1-2z], which provides: 'The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered.' When a stat-

---

to this court's consideration of the issues on appeal. See, e.g., *Norwalk* v. *Farrell*, 80 Conn. App. 399, 406 n.10, 835 A.2d 117 (2003), citing *Niehaus* v. *Cowles Business Media, Inc.*, 263 Conn. 178, 184, 819 A.2d 765 (2003).

ute is not plain and unambiguous, we also seek interpretive guidance from the legislative history of the statute and the circumstances surrounding its enactment, the legislative policy it was designed to implement, the statute's relationship to existing legislation and common-law principles governing the same general subject matter." (Citation omitted.) *Teresa T.* v. *Ragaglia*, 272 Conn. 734, 742, 865 A.2d 428 (2005).

Section 52-278d (a) provides in relevant part: "The defendant shall have the right to appear and be heard at the hearing [on the prejudgment remedy application]. The hearing shall be limited to a determination of (1) whether or not there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff . . . . If the court, upon consideration of the facts before it and taking into account any defenses, counterclaims or set-offs, claims of exemption and claims of adequate insurance, finds that the plaintiff has shown probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought and finds that a prejudgment remedy securing the judgment should be granted, the prejudgment remedy applied for shall be granted as requested or as modified by the court. . . ."

Although a cursory reading of the statute might lead one to conclude that it limits a court to the granting of a prejudgment remedy order in an amount equal to or greater than the amount sought in the application for prejudgment remedy, we conclude, after thoroughly examining the text of the statute and its relationship to other statutes, General Statutes §§ 52-278c (g) and 52-278k in particular, that § 52-278d (a) clearly and unambiguously does not preclude a court from granting

a prejudgment remedy order that authorizes an attachment for an amount *less than* the amount sought in the application for prejudgment remedy. We also conclude, contrary to the defendants' alternative argument, that the statute does not require the court, before issuing such an order for a lesser amount, to determine that there exists probable cause that a judgment in at least the amount sought in the application for prejudgment remedy will be rendered in the matter in favor of the plaintiff.

Reading § 52-278d (a) as either (1) limiting a court's authority to grant a prejudgment remedy in an amount *equal to or greater than* the amount sought in the application for prejudgment remedy or (2) allowing a court to issue a prejudgment remedy order for an amount less than the amount sought in the application for prejudgment remedy, but only when the court first finds probable cause that a judgment *in at least the amount sought* in the application for prejudgment remedy will be rendered in favor of the plaintiff, is, we believe, an inaccurate reading.

Section 52-278c (g) provides in relevant part that "[a] defendant may request a hearing to contest the application for a prejudgment remedy . . . by [filing] any proper motion or by return[ing] to the Superior Court . . . a signed claim form that indicates . . . that the amount sought in the application for the prejudgment remedy is unreasonably high . . . ." Section 52-278k provides in relevant part that "[t]he court may, upon any application for prejudgment remedy under [General Statutes §§] 52-278c, 52-278e, 52-278h or 52-278i, modify the prejudgment remedy requested as may be warranted by the circumstances. . . ."[10] We find

---

[10] Although the plaintiff did not specifically state under which statute it was bringing its application for prejudgment remedy, it is apparent from the record that it was seeking an attachment under either General Statutes §§ 52-278c or 52-278e.

those statutes to be instructive on whether a court, under § 52-278d (a), may grant a prejudgment remedy for an amount less than that sought by a plaintiff in an application for prejudgment remedy, particularly when there is probable cause that a judgment only *in that lesser amount, and not more*, will be rendered in the plaintiff's favor. In granting to the court the authority to modify the prejudgment remedy requested, § 52-278k does not expressly exclude from that authority the power to *reduce* the amount of the prejudgment remedy requested, or sought,[11] in the application for prejudgment remedy. In fact, with § 52-278c (g) permitting a defendant to challenge the amount sought in the application as "unreasonably high," it is only logical that § 52-278k should be read as authorizing the court to reduce the amount sought in the plaintiff's application for prejudgment remedy to a lower, more reasonable amount. As such, if the circumstances warrant, the court may modify the prejudgment remedy sought to a lesser amount, thereby making that lesser amount the amount that is "sought." The language "amount of the prejudgment remedy sought" in § 52-278d (a), therefore, can mean either the amount listed in the application for prejudgment remedy or a lesser amount that is the amount listed in the application for prejudgment remedy *as modified by the court*. Furthermore, § 52-278d (a) (1) does *not* require the court to determine whether there is probable cause that a judgment in the amount of the prejudgment remedy sought *in the application for prejudgment remedy* will be rendered in the plaintiff's favor. It simply requires the court to determine whether there is probable cause that a judgment will be rendered in the plaintiff's favor in the amount of the prejudgment remedy *sought*.

---

[11] That which is "requested" also is that which is "sought." See American Heritage Dictionary of the English Language (New College Ed. 1981) (defining verb "seek" as "to . . . request").

We therefore hold that a court may grant a prejudgment remedy order that authorizes an attachment for an amount less than that sought in the application for prejudgment remedy as long as there is probable cause that a judgment in that lesser amount, taking into account any defenses, counterclaims or setoffs, will be rendered in the plaintiff's favor. Accordingly, the defendants' first claim fails.

## II

Having concluded that the court may issue a prejudgment remedy order that authorizes an attachment for an amount less than the amount specifically requested in the prejudgment remedy application, we address the defendants' next claim, which is that the evidence presented supports, at best, a finding of probable cause that a judgment in the amount of $13,448.51, not $22,993.18, will be rendered in the matter in the plaintiff's favor. In support of that argument, the defendants assert that the only documentary evidence submitted by the plaintiff to the trial court was a one page compilation of monthly billing periods occurring between January 10, 2002, and September 3, 2003,[12] and that the sum total of all the charges listed for those periods is only $13,448.51, not $22,993.18, as was listed next to "current balance" on the document.

"The legal idea of probable cause is a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. . . . Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false."

[12] The defendants actually assert that the compilation reflects bills from *February 7, 2002*, to September 3, 2003. A careful review of the compilation reveals, however, that the period was from *January 10, 2002*, to September 3, 2003.

(Internal quotation marks omitted.) *Orsini* v. *Tarro*, 80 Conn. App. 268, 272, 834 A.2d 776 (2003).

"This court's role in reviewing the trial court's probable cause determination is limited. In its determination of probable cause, the trial court is vested with broad discretion which is not to be overruled in the absence of clear error. . . . Our role as a reviewing court is limited to determining whether the trial court's conclusion was reasonable, and we may not duplicate the trial court's weighing process. . . . In the absence of clear error, this court should not overrule the thoughtful decision of the trial court, which has had an opportunity to assess the legal issues which may be raised and to weigh the credibility of at least some of the witnesses." (Citations omitted; internal quotation marks omitted.) *Green* v. *Holy Trinity Church of God in Christ*, 16 Conn. App. 700, 703–704, 549 A.2d 281 (1988); see also *Bank of Boston Connecticut* v. *Schlesinger*, 220 Conn. 152, 156–57, 595 A.2d 872 (1991). Therefore, we need decide only whether the court's conclusion that there was probable cause that a judgment in the amount of $22,993.18, taking into account any defenses, counterclaims or setoffs, would be rendered in the plaintiff's favor, was reasonable under the clearly erroneous standard of review. We conclude that it was reasonable under that standard.

The defendants correctly state that the compilation identifies charges only for the billing periods between January 10, 2002, and September 3, 2003, and that the sum total of the charges for those periods is $13,448.51. The defendants also correctly state that the compilation listed $22,993.18, not $13,448.51, as the "current balance." We note, however, that the court had other evidence before it that, in our opinion, makes the court's probable cause determination reasonable under the clearly erroneous standard of review.

As previously mentioned, the defendants filed with their motion for a hearing a memorandum of law in opposition to the plaintiff's application for prejudgment remedy. Attached to that memorandum, and labeled exhibit F, was a copy of Bess Gilmore's June 10, 2003 utility statement from the plaintiff. Without expressing an opinion as to the accuracy of that statement, we note that it indicated that she then owed $20,210.95; $639.46 of that sum represented services provided from May 2 to June 3, 2003, and $19,571.49 represented her forwarded unpaid balance.[13] The $639.46 charge for services provided from May 2 to June 3, 2003, that was listed on the June 10, 2003 statement for services matches precisely the amount that the aforementioned compilation lists as being charged for the period of May 2, 2003, to June 3, 2003. Taking into consideration, then, (1) that the June 10, 2003 statement indicates an unpaid balance of $19,571.49 for billing periods prior to the May 2 to June 3, 2003 period,[14] (2) that both the June 10, 2003 statement and the aforementioned compilation indicate $639.46 as being owed for the May 2 to June 3, 2003 billing period, (3) that the compilation indicates $955.22 as being owed for the June 3 to July 2, 2003 billing period, $896.43 as being owed for the July 2 to August 4, 2003 billing period and $930.58 as being owed for the August 4 to September 3, 2003 billing period, and

[13] The June 10, 2003 statement also indicated that there was an adjustment to Bess Gilmore's previous balance, $21,375.38, in the amount of $1803.89. This adjustment, according to the testimony of Murphy, represented a refund of late charges, because of Bess Gilmore's medical hardship status, and did not represent payments made to the account. That adjustment also may be seen on the plaintiff's exhibit one, the compilation, which was offered into evidence at the prejudgment remedy hearing.

[14] Although the defendants contest the accuracy of the meter, there is no evidence in the record that suggests Bess Gilmore was not given credit for any and all payments that she made to the plaintiff. As such, the court was within its discretion to believe, whether the meter was functioning properly or not, that there was an unpaid balance of $19,571.49 for services provided until, but not including, the May 2 to June 3, 2003 billing period.

(5) that the sum of those figures, $19,571.49, $639.46, $955.22, $896.43 and $930.58, is $22,993.18, or precisely the amount of the attachment authorized by the court's prejudgment remedy order, we conclude that it was not clear error for the court to find probable cause that a judgment in the amount of $22,993.18 will be rendered in the matter in the plaintiff's favor.

Furthermore, the court had before it the testimony of Murphy, who stated that the meters were functioning properly, that he personally viewed equipment and appliances in the defendants' home that could generate large utility bills, and that Bess Gilmore had a very large delinquent balance, $22,993.18. To rebut that testimony, the defendants refer to Bess Gilmore's testimony. As previously mentioned, she testified (1) that she and her sons "use very little electricity, keep all the lights off upstairs . . . don't use the pool [and use] some of the rooms . . . just for storage," (2) that the broadcasting equipment of which Murphy spoke had not been used for approximately thirty years, (3) that the plaintiff's representatives who came in August, 1999, could not account for one third of the electrical use and (4) that she would be filing a counterclaim against the plaintiff because, according to her, "they owe[d] [her] a great deal of money."

We note, however, that the trial court has the advantage of being able to weigh the credibility of witnesses. Furthermore, although Bess Gilmore testified that she would be filing a counterclaim against the plaintiff, she also stated that she did not know how much the plaintiff owed her. Finally, the court itself found it to be instructive on the matter, and we agree, that "Mrs. Gilmore is not an expert in electricity." Without the testimony of someone having technical experience with meters to rebut the plaintiff's evidence that the meter was functioning properly, the court was well within its discretion to believe that the meter was functioning properly and

that Bess Gilmore owed $22,993.18 as of September 23, 2003.

Under those circumstances, the court reasonably determined there to be probable cause that a judgment in the amount of $22,993.18, taking into account any defenses, counterclaims or setoffs, will be rendered in the plaintiff's favor. Accordingly, the defendants' second claim fails.

### III

The defendants' final claim is that the court improperly included in the prejudgment remedy order Keith Gilmore and Douglas Gilmore as persons whose interests could be subject to attachment by the plaintiff. In support thereof, the defendants argue that only customers of account and their spouses, not their adult children residing with them, can be liable for payment of utility services provided to their homes[15] and, therefore, that the court improperly included Keith Gilmore and Douglas Gilmore in the prejudgment remedy order. We agree with the defendants that the court should have limited the prejudgment remedy order to Bess Gilmore, but do so for reasons other than those posited by the defendants. We therefore need not decide whether a customer's adult children who reside with the customer in the customer's home can be liable for payment of utility services provided to that home.

As previously mentioned, in reviewing a court's decision to deny or to grant a prejudgment remedy, we

---

[15] Section 16-3-100 (a) (1) of the Regulations of Connecticut State Agencies provides: " 'Customer' or 'customer of account' means any person or entity which has contracted with a utility company for utility service. If residential utility service has gone to the joint benefit of spouses or to the support of their family then both spouses are customers of the utility company even if only one spouse expressly contracted with the company for residential utility service. For the purposes of subsection (j) of this section, the spouse who expressly contracted for residential utility service is the named customer and the spouse who did not expressly contract for such service is the unnamed customer . . . ."

decide only whether that decision constituted clear error. See *Bank of Boston Connecticut* v. *Schlesinger,* supra, 220 Conn. 157; *Green* v. *Holy Trinity Church of God in Christ,* supra, 16 Conn. App. 704.

The plaintiff acknowledges that it initially sought in its application for prejudgment remedy an attachment against all three defendants, but contends that later, at the prejudgment remedy hearing, it informed the court that it was seeking an attachment against *only* the real estate of Bess Gilmore. At the hearing, the plaintiff stated that it was "seeking an attachment against the property owned by Bess Gilmore, 11 Harding Lane," and that *"for purposes of the prejudgment remedy [the plaintiff] only focused on Bess Gilmore,* the owner of the property and the owner of the real estate that [it was] seeking to attach." (Emphasis added.)

The defendants' concern stems from the fact that despite the plaintiff's aforementioned statements to the court, the court issued a written prejudgment remedy order authorizing an attachment not only against the real property of Bess Gilmore, but also against such additional property of Keith Gilmore and Douglas Gilmore as might be discovered pursuant to their disclosure of assets. Although the plaintiff has indicated that it agrees that the prejudgment remedy order should have been limited to Bess Gilmore and has no intention of using the order to record attachments against Keith Gilmore and Douglas Gilmore, the defendants argue that they should not have to rely on such assurances and that the prejudgment remedy order should not be allowed to stand, at least as against Keith Gilmore and Douglas Gilmore.[16]

---

[16] The plaintiff argues that the defendants should have filed a motion to correct or to modify the order pursuant to General Statutes § 52-278k and that the plaintiff would have stipulated to such a modification of the order. Section 52-278k provides in relevant part: "The court may, upon motion and after hearing, at any time modify or vacate any prejudgment remedy granted or issued under this chapter upon the presentation of evidence which would have justified such court in modifying or denying such prejudgment remedy under the standards applicable at an initial hearing."

A careful review of the record, including the transcript of the prejudgment remedy hearing, reveals that the plaintiff, while maintaining that Keith Gilmore and Douglas Gilmore were liable under a theory of unjust enrichment for utility services provided to the home where they live, sought from the court a prejudgment remedy order authorizing it to record an attachment against *only* the interest of Bess Gilmore.[17] We therefore conclude that the court properly granted the prejudgment remedy order, but only to the extent that it author-

We note, however, that under General Statutes § 52-278*l* (a), "[a]n order (1) granting or denying a prejudgment remedy following a hearing under section 52-278d . . . shall be deemed a final judgment for purposes of appeal." The defendants therefore had no obligation to file a motion to correct or to modify under § 52-278k.

[17] The defendants refer to certain colloquy from the hearing as evidence that the plaintiff wanted the court to grant a prejudgment remedy order not only against Bess Gilmore, but against Keith Gilmore and Douglas Gilmore as well. The defendants refer to the following colloquy:

"[The Defendants' Counsel]: Motion for disclosure and assets regarding Douglas G. Gilmore and Keith P. Gilmore—this is a very interesting part of the case, Your Honor, I think from a legal point of view and from a social point of view. I haven't found a case in the state of Connecticut; I haven't found a case in the country where children were liable for their parent's bill.

"[The Plaintiff's Counsel]: Excuse me, Your Honor. If I may, for purposes of the prejudgment remedy, we've only focused on Bess Gilmore, the owner of the property and the owner of the real estate that we're seeking to attach. And so, you know, I just want to point that out so [that the defendants' counsel] doesn't have to waste his time with respect to *this*.

"The Court: You're not, you wouldn't pursue *it* against the other two?

"[The Plaintiff's Counsel]: Oh, we do intend to pursue *it*. For purposes of the prejudgment remedy application, I don't think *it*'s relevant because we're only seeking the attachment—

"The Court: I'll allow his argument then." (Emphasis added.)

Our own reading of that colloquy, however, convinces us that the defendants are confusing the plaintiff's expression of its intention to pursue the underlying nonprejudgment remedy litigation against Keith Gilmore and Douglas Gilmore with the plaintiff's expression of its intention not to seek a prejudgment remedy attachment against the Gilmore sons. The defendants interpret "we intend to pursue it" as "we intend to pursue [prejudgment remedy attachments against Keith and Douglas Gilmore]" when, instead, they should interpret the statement as meaning "we intend to pursue [the underlying claim against defendants Keith and Douglas Gilmore, but do not seek attachments against them.]"

ized the plaintiff to secure attachments against the real estate and interest of Bess Gilmore.[18]

The judgment is reversed only as to Keith Gilmore and Douglas Gilmore and the case is remanded for further proceedings in accordance with law. The judgment is affirmed in all other respects.[19]

In this opinion the other judges concurred.

---

[18] There is a document titled "Modification of Prejudgment Remedy Order" filed October 15, 2004. It states: "Based upon the arguments presented to this court during the September, 2004 court hearing, this court hereby modifies the prejudgment remedy entered in this matter. The plaintiff's examination of judgment debtor is limited to those parties *served* in this matter." (Emphasis added.) We do not believe, however, that this modification, as worded, revokes the plaintiff's authority under the original prejudgment remedy order to attach the interests of Keith Gilmore and Douglas Gilmore because even though the plaintiff only recorded an attachment against Bess Gilmore, it *served* all three defendants with, among other documents, a copy of that recorded attachment and the original prejudgment remedy order. Each of the defendants having been served, the modification does nothing to change the original prejudgment remedy order.

[19] In a letter dated April 12, 2005, counsel for the plaintiff informed this court that on February 10, 2005, one day after the parties made their oral arguments before this court, the plaintiff filed with the trial court a motion to correct the prejudgment remedy order. In that motion, the plaintiff requests that the prejudgment remedy order be limited to Bess Gilmore. On April 6, 2005, the court granted that motion. Because the order granting the prejudgment remedies against Bess Gilmore, Douglas Gilmore and Keith Gilmore was a final judgment, the trial court's order (issued *after* arguments with this court) vacating that judgment in part is insufficient, the judgment not having been opened.