CONNECTICUT LIGHT AND POWER COMPANY *v.* BESS P. GILMORE ET AL. (SC 18081)

Norcott, Katz, Palmer, Zarella and Blue, Js.

Argued March 14—officially released October 21, 2008

*Douglas Gilmore*, for the appellant (named defendant).

*Jeanine M. Dumont*, with whom, on the brief, was *Melissa A. Nesheim* for the appellee (plaintiff).

*Opinion*

ZARELLA, J. In this collection action by the plaintiff, Connecticut Light and Power Company, against the defendants, Bess P. Gilmore, Douglas G. Gilmore, Keith P. Gilmore and Community Club Awards, Inc., for unpaid electric bills, the defendant Bess Gilmore[1] appeals from the judgment of the trial court rendered in favor of the plaintiff. On appeal, the defendant claims that the judgment should be reversed and a new trial ordered because: the plaintiff's attorney referred during rebuttal argument to evidence excluded at trial; the jury improperly considered the excluded evidence in reaching a verdict for the plaintiff; and three jurors failed to disclose prior business relationships with the law firm of the plaintiff's attorney. The defendant also claims that reversal is required because the trial court improperly: denied her motion for disclosure by the

---

[1] All future references to the defendant in the singular are to Bess Gilmore, the only remaining defendant in this action.

plaintiff's law firm of all prior communications with the jurors; admitted into evidence documents offered by the plaintiff under the business records exception to the hearsay rule; instructed the jury that it could not consider that the plaintiff had charged the defendant the incorrect billing rate for a period of several years; awarded the plaintiff offer of judgment interest; and denied the defendant's motion in limine to preclude the admission of prejudicial evidence regarding prior proceedings. We affirm the judgment of the trial court.

A jury reasonably could have found the following facts. The defendant resides at 11 Harding Lane in Westport with her two adult sons, Douglas Gilmore and Keith Gilmore. The residence, which is owned by the defendant, is also used by Douglas Gilmore's law practice and Community Club Awards, Inc., a Connecticut corporation owned and operated by the defendant and her sons, as their business address. At all relevant times, the plaintiff provided electric utility services to 11 Harding Lane at a rate approved by the department of public utility control (department).

Over the years, the defendant repeatedly complained to the plaintiff about her high electric bills. In an attempt to resolve her concerns, the plaintiff conducted an energy audit of her home on August 6, 1999, and a meter test on September 29, 1999. Thereafter, the plaintiff sent a letter to the defendant stating that the meter test indicated a meter accuracy of 99.88 percent, well within the parameters established by the department for meter accuracy.

In August, 2000, the defendant requested that an independent investigation be conducted by a review officer,[2] which the plaintiff agreed to provide. Following the

[2] Review officers, who are not part of the plaintiff's customer service organization, conduct independent investigations to resolve customer billing disputes.

investigation, which included another energy audit and meter test, the review officer sent the defendant a letter dated September 6, 2000 (report), in which she described her findings. Upon receiving the report, the defendant requested that the department investigate the review officer's findings. On December 6, 2001, several department employees visited the defendant's home and conducted additional tests. Six months later, the department sent a report containing its findings to the defendant. See footnote 9 of this opinion.

The plaintiff continued to provide 11 Harding Lane with electric utility services, even though the defendant withheld payments on her account in defiance of repeated demands by the plaintiff that she pay her bills in full. On May 28, 2003, the plaintiff filed an application for a prejudgment remedy and a complaint against the defendant and her sons seeking to attach, to the value of $25,900, their respective interests in real and personal property because of their failure to pay the defendant's electric utility bills, which amounted to $21,375.38 for services rendered to that date. After a hearing, the trial court ruled that there was probable cause to sustain the validity of the plaintiff's claim. *Connecticut Light & Power Co.* v. *Gilmore*, 89 Conn. App. 164, 166–72, 875 A.2d 546, cert. denied, 275 Conn. 906, 882 A.2d 681 (2005). On September 29, 2003, the court issued a prejudgment remedy order authorizing an attachment in the amount of $22,933.18. Id., 168, 171.

On October 6, 2003, the plaintiff amended the complaint to add Community Club Awards, Inc., as a fourth defendant.[3] Thereafter, the defendant and her sons appealed to the Appellate Court from the prejudgment

[3] According to the marshal's return of service, three true and attested copies of the process were served, respectively, on the defendant (individually and as president), Douglas Gilmore (individually and as secretary) and Keith Gilmore (individually and as treasurer) at the usual place of abode of each, namely, 11 Harding Lane in Westport.

remedy order. Id., 165–66. On May 24, 2005, the Appellate Court affirmed the order with respect to the attachment of real property owned by the defendant, but reversed the order insofar as it applied to the personal property of her sons. Id., 180–83.

On December 15, 2005, the plaintiff filed a revised complaint.[4] The defendants, collectively, filed an answer and special defenses, and the defendant filed a counterclaim, after which the matter was tried to a jury. On April 18, 2006, at the start of the trial, the plaintiff withdrew its claims of unjust enrichment against all defendants. On April 24, 2006, it withdrew all remaining claims against Keith Gilmore. On April 25, 2006, following presentation of the evidence, the court acknowledged that the plaintiff had withdrawn the complaint against Keith Gilmore and directed a verdict in favor of Keith Gilmore, Douglas Gilmore and Community Club Awards, Inc. The court also directed a verdict for the plaintiff on all claims raised by the defendant's counterclaim, except for the claim alleging breach of contract. The remaining claims against the defendant were sent to the jury, which returned a verdict for the plaintiff in the amount of $45,072.94. The jury also returned a verdict for the plaintiff on the breach of contract count of the counterclaim. Thereafter, the plaintiff filed a motion for offer of judgment interest and a bill of costs, and the defendant filed motions for judgment notwithstanding the verdict and for a new trial. The court granted the plaintiff's motion for offer of judgment interest and denied the defendant's motions. On June 20, 2006, the court rendered judgment for the plaintiff in the amount of $45,072.94, plus offer of judgment interest in the

---

[4] The complaint alleged breach of express contract against Bess Gilmore (count one), breach of implied contract against Douglas Gilmore, Keith Gilmore, Community Club Awards, Inc., and Bess Gilmore (counts two, three, four and five, respectively) and unjust enrichment against Douglas Gilmore, Keith Gilmore, Bess Gilmore and Community Club Awards, Inc. (counts six, seven, eight and nine, respectively).

amount of $14,623.67 and costs of $756.20, for a total award of $60,452.81.[5] This appeal followed.[6]

## I

The defendant first claims that the judgment should be reversed and a new trial ordered because, during rebuttal argument, counsel for the plaintiff improperly referred to evidence excluded at trial and to the defendant's repeated objections to admission of the excluded evidence. The defendant further claims that the trial court improperly failed to give the jury a curative instruction to neutralize the prejudicial effect of the rebuttal argument. The evidence in question consisted of the reports by the review officer and the department confirming the accuracy of the electric meter at the defendant's residence and concluding that there had been no error in the defendant's electric utility bills. The defendant contends that the remarks were especially damaging because the reports related to the principal question before the jury and one of the reports was issued by the department, which was lauded throughout the trial as an impartial expert on utility operations and the ultimate arbiter of the parties' dispute.

The plaintiff responds that the rebuttal argument was not improper because counsel did not disclose the contents of the reports to the jury. Furthermore, the defense objected so many times to the admission of the reports that counsel's reference to the objections did not expose the jury to anything that they did not already know. The plaintiff finally argues that the defendant is estopped from complaining about the rebuttal argument because defense counsel himself initially brought the

---

[5] The court also awarded costs in the amount of $925 to Douglas Gilmore, Keith Gilmore and Community Club Awards, Inc.

[6] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

reports to the jury's attention when he declared during closing argument that the defendant had been given no reports following visits to her home by the plaintiff and the department to investigate her complaint. Thus, counsel for the plaintiff could not be silent and allow the jury to believe that the defendant had been given no reports. We agree with the plaintiff.

At trial, when the plaintiff's counsel attempted to enter a copy of the review officer's report into evidence, defense counsel objected on hearsay grounds. The court sustained the objection but allowed Thomas Murphy, a credit and collections supervisor employed by the plaintiff, to testify that the report did not satisfy the defendant or resolve her complaints. Murphy explained that he believed this to be the case because the defendant had appealed to the department and requested another investigation after she received the report.

Murphy then testified that the department had agreed to conduct the requested investigation, and he proceeded to explain the various steps involved. Defense counsel made numerous objections to Murphy's testimony, all of which were overruled. When counsel objected to a question regarding the department's ultimate conclusions, however, the court excused the jury and conducted a hearing on the matter. The court ultimately sustained defense counsel's objection on the ground that the introduction of expert testimony regarding the department's conclusions would invade the province of the jury.[7]

---

[7] The court stated: "You can discuss . . . the fact that a request was made of the [department] for a hearing. Was a hearing held? No. As a result of that what did they do? They went on and did other things including bringing this action. But the decision of the [department] which was the only thing that was raised, they're not a part of this case. . . . I think a jury has a right to consider the fact that the [department] was brought into this matter. Was involved. That they were involved in the process, assuming that there are sufficient facts to submit to them regarding any of those allegations in your counterclaims or in your special defenses."

After the hearing, the court did not admit evidence regarding the test results, but allowed Murphy to testify that he believed that the defendant had not been satisfied with the results because she had failed to respond to the plaintiff's subsequent request to make payments on her account. Murphy also was allowed to testify that, following the department's investigation, the plaintiff had made no adjustments to the defendant's account.

Thereafter, defense counsel declared during closing argument that the plaintiff's representatives had failed to provide the defendant with a report following their visit to her residence on August 6, 1999. Counsel also stated that the defendant had not been provided with a report after a subsequent visit by Murphy in 2001 in connection with the department's investigation.[8] Counsel for the plaintiff responded to these comments by declaring during rebuttal argument that the defendant had been given reports: "There was a report. We offered the report of . . . the review officer. [Defense counsel] objected to it. He didn't want you to see that. And there was another report. It went to the [department]. There's a report there. He objected. He didn't want you to see it. Okay? So there have been reports."[9]

Following closing arguments and outside the presence of the jury, defense counsel objected to the comments made during rebuttal argument and requested a curative instruction that the jury was not to consider the objections he had raised at trial to admission of the

[8] Defense counsel argued: "A gentleman from collections and two [other] people . . . came over to [the defendant's] home on August 6, 1999. Seven years ago with no memorandum to her. No report. . . . [N]o report except their own notes that they didn't show [the defendant] at the time or send to her . . . soon thereafter. No report. . . . [W]hen Mr. Murphy came in 2001, no report. No memorandum."

[9] Although the department report was not entered into evidence, an appendix to the defendant's brief contains a copy of the report dated June 5, 2002, indicating that it was forwarded by certified mail to all parties of record.

reports. The court agreed to instruct that counsel for the parties have a right to object and that such objections should not be held against the attorneys or their clients. The court later instructed as it had promised the defense.[10] It also instructed that attorneys are not witnesses and that the arguments of attorneys are not evidence, but are designed to help the jury interpret the evidence. The court further explained that, to the extent that it had sustained any objections to the admission of documentary evidence, the excluded evidence would not be permitted in the jury room. The court added that the jury would be allowed to consider only full exhibits or documents admitted into evidence.

On June 1, 2006, the defendant filed a motion for a new trial based in part on her claim that opposing counsel's rebuttal argument was improper. At a hearing on the matter, the court explained that it had given curative instructions to mitigate any potential damage caused by the remarks. It then denied the motion.

We begin our analysis by setting forth the applicable standard of review. "A motion for a new trial is addressed to the sound discretion of the trial court and will never be granted except on substantial grounds." (Internal quotation marks omitted.) *Bernier* v. *National Fence Co.*, 176 Conn. 622, 628, 410 A.2d 1007 (1979); *Burr* v. *Lichtenheim*, 190 Conn. 351, 355, 460 A.2d 1290 (1983).

---

[10] The court instructed as follows: "If the attorneys made an objection at any time, either an objection to a question or the objection to the introduction of any evidence, they not only [have] a right to make an objection if they believed a question is improper or they believe that some evidence should not be introduced, under the Code of Evidence or the rules of evidence, they have a professional obligation to their clients to do so. So please don't hold it against them or against their clients. . . . If I overruled an objection it means that the question could be answered. Whether you accept that answer to be true is a determination for you to make in your capacity as the trier of fact."

It is well established that "[an attorney], in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . . [An attorney] may [however] properly respond to inferences raised by the defendant's closing argument." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 717, 793 A.2d 226 (2002); see also 75A Am. Jur. 2d 63–64, Trial § 470 (2007) ("The law indulges a liberal attitude toward comments which are a fair retort or response to the prior argument of opposing counsel. Thus, arguments which are replies in kind or are provoked by arguments of opposing counsel do not amount to reversible error.").

In the present case, defense counsel stated during closing argument that the defendant had not been given any reports following the inspections of her residence in 1999 and 2001. The plaintiff's counsel countered during rebuttal argument that reports had been produced by the review officer and the department, respectively, after their investigations and that defense counsel had objected to their admission. The remarks by the plaintiff's counsel thus were made to correct defense counsel's misrepresentation to the jury that the defendant had received no reports. Furthermore, counsel for the plaintiff did not disclose the contents of the reports, but limited her remarks to the fact that reports had been made following the investigations and that they had not been admitted into evidence because of defense counsel's objections.

In addition, even if the rebuttal argument left the impression that the department had not ruled in favor of the defendant, other evidence in the record—that the plaintiff determined that the meter was accurate in

1999, that the defendant had not been satisfied with the meter test results and that the plaintiff had made no adjustments to the defendant's utility bill following the inspections—suggested more directly that the plaintiff and the department had concluded that the defendant's utility bills, and the meter readings on which they were based, were accurate.

Finally, to the extent that any impropriety may have occurred, the court instructed the jury that arguments are not evidence, that it could consider only those documents that had been entered into evidence and that objections raised throughout the trial were not to be held against the attorney or the client. Accordingly, the trial court did not abuse its broad discretion in denying the defendant's motion for a new trial on the ground of attorney misconduct because the disputed portion of the rebuttal argument, when considered in context, was invited by the defense and any potential prejudice to the defendant was mitigated by the court's curative instructions to the jury.

The defendant argues that the present case is similar to *Hoxie* v. *Home Ins. Co.*, 33 Conn. 471, 474–75 (1866), in which a new trial was ordered after the plaintiff's counsel revealed to the jury during closing argument the contents of a document excluded from evidence at trial. We disagree. In *Hoxie*, the court observed that "the statement of the counsel had all the effect upon the minds of the jury that the [document] itself could have had, had it been received in evidence," because defense counsel had objected to the prejudicial statement in the presence of the jury and the trial court had allowed counsel to elaborate upon the statement following the objection. Id., 475. In contrast, the plaintiff's counsel in the present case did not reveal to the jury the contents or conclusions of the reports, defense counsel did not object to the rebuttal argument in the presence of the jury, and the court did not render a

decision allowing the plaintiff to make further references to the excluded information that would have induced the jury to consider the information in reaching a decision. Accordingly, *Hoxie* is distinguishable on the facts.

The defendant also argues that reversal is required under *Fonck* v. *Stratford*, 24 Conn. App. 1, 3, 584 A.2d 1198 (1991), and *Wallenta* v. *Moscowitz*, 81 Conn. App. 213, 233, 839 A.2d 641, cert. denied, 268 Conn. 909, 845 A.2d 414 (2004), in which the Appellate Court declared that "a statement by counsel, not under oath, of a material fact pertinent to the issues unsupported by evidence, and prejudicial to the opposing party, constitutes reversible error unless it appears that the prejudicial effect has been effectively averted by an instruction to disregard the statement, or otherwise. . . . It is the duty of [this court] to weigh the probable effect of the statement upon the issues of the case, then look to the action of the trial court in dealing with it, and if it is reasonably clear that the effect has not been eliminated, reversal is required." (Internal quotation marks omitted.) We disagree. It was not the plaintiff's counsel, but, rather, defense counsel, who initially referred to the reports when he stated during closing argument that the defendant had received no reports. Moreover, the plaintiff's counsel did not refer to the conclusions in the reports or to any material facts. Finally, the trial court instructed the jury that it was not to consider arguments as evidence or any documents that had not been introduced into evidence during their deliberations. Accordingly, the defendant's claim has no merit.

II

The defendant next claims that the judgment should be reversed and a new trial ordered because the jury improperly considered the excluded evidence and defense counsel's objections thereto as a direct result

of the remarks made by the plaintiff's counsel during her rebuttal argument. The plaintiff responds that the jury merely discussed the natural consequences of defense counsel's objections raised when the plaintiff's counsel attempted to introduce the evidence at trial. We agree with the plaintiff.

Following the trial, one of the jurors, Joseph Yuhas, wrote a letter to the court suggesting that there had been "a miscarriage of justice in the jury room deliberation[s]." Yuhas recalled that the jury had been asked to leave the courtroom after defense counsel objected to admission of the department's report, that the court had decided not to admit the report and that the court later had instructed the jury not to allow the report or its exclusion to affect the deliberations. Yuhas then stated: "This is where I feel the miscarriage of justice begins." Yuhas explained that, in violation of the court's instructions, the foreman and some of the jurors had discussed why defense counsel had objected to admission of the evidence and ultimately concluded that defense counsel was "hiding something . . . ." Yuhas thus declared his belief that "some of the jurors were influenced by this discussion and . . . did not make a fair and proper decision based on the directions given by the court. . . . I feel assumptions were made." Yuhas did not state, however, that any of the juror's votes, including his own, had been affected by the discussion. He also made no reference to the rebuttal argument.

The defendant subsequently raised the issue of juror misconduct in her June 1, 2006 motion for a new trial. On June 2, the court held a hearing on the matter. The court initially noted the attempt by the plaintiff's counsel to introduce the report, defense counsel's objections to admission of the report and the curative instructions that it had given the jury on objections, documentary evidence, the role of lawyers and the distinction between argument and evidence. The court

stated that it had intended to highlight the jury's responsibility without highlighting any specific piece of excluded evidence because several items had been excluded and it expected the jury to follow the law. The court then discussed whether it should ask Yuhas to appear for the purpose of repeating under oath what he had stated in his letter and whether the other jurors also should be asked to appear, but counsel for the parties agreed that it would not be necessary to recall the jurors.[11]

On June 12, 2006, the defendant filed a supplemental motion in arrest of judgment for extrinsic causes claiming, in part, that the jurors improperly had considered extrinsic evidence. On June 20, 2006, the court continued the hearing on the issue of juror misconduct. The court denied the motion for a new trial, concluding that, given the unanimity of the verdict, it did not believe that the jurors' discussion of whether defense counsel was "hiding something" satisfied the probable prejudice standard or indicated that the verdict had been affected by juror partiality, prejudice, corruption or mistake. The court explained that the proffered evidence was an exhibit marked for identification only and was not before the jury. It also observed that the Yuhas letter did not suggest that the verdict had been influenced by probable prejudice. Yuhas did not refer to any comments by the plaintiff's counsel and did not appear to

[11] The court and the parties discussed the fact that Connecticut case law does not permit the court to inquire into the mental impressions of the jurors and their reasoning in reaching a verdict. The court also observed that it had not admitted the department report into evidence, and, therefore, the jurors' testimony would be limited to whether they had discussed the rebuttal argument because they could not discuss whether it had affected their decision. The court finally stated that it did not think that the defendant would be disadvantaged by accepting the letter as an exhibit for purposes of the hearing instead of asking Yuhas to testify in court as to the letter's contents. In a second hearing on June 20, 2006, the court stated that it would accept the statements in the letter as if they had been given under oath.

exhibit "buyer's remorse." In addition, the mere fact that the jury knew that the defendant had complained to the department was no more indicative of the outcome of the dispute than the fact that the lawsuit had been brought by the plaintiff. The court finally expressed confidence that the jury had followed its curative instruction that arguments are not evidence.

As previously stated, "[a] motion for a new trial is addressed to the sound discretion of the trial court and will never be granted except on substantial grounds." (Internal quotation marks omitted.) *Bernier* v. *National Fence Co.*, supra, 176 Conn. 628. Although juror misconduct may provide the substantial grounds necessary to grant such a motion, "not every instance of juror misconduct requires a new trial." *Speed* v. *DeLibero*, 215 Conn. 308, 313, 575 A.2d 1021 (1990). "The rule, long ago enunciated by this court, is that if it does not appear that [the juror misconduct in question] was occasioned by the prevailing party, or any one in his behalf; if it do[es] not indicate any improper bias upon the juror's mind, and [if] the court cannot see, that it either had, or might have had, an effect unfavorable to the party moving for a new trial; the verdict ought not to be set aside. *Bernier* v. *National Fence Co.*, [supra, 628], quoting *Pettibone* v. *Phelps*, 13 Conn. 445, 450 (1840)." (Internal quotation marks omitted.) *Williams* v. *Salamone*, 192 Conn. 116, 119, 470 A.2d 694 (1984). "[T]he burden is on the moving party in a civil proceeding to establish that juror misconduct denied him a fair trial. . . . That burden requires the moving party to demonstrate that the juror misconduct complained of resulted in probable prejudice to the moving party." (Citations omitted; internal quotation marks omitted.) *Speed* v. *DeLibero*, supra, 313–14. In sum, the test is "whether the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror." (Internal

quotation marks omitted.) *Williams* v. *Salamone*, supra, 122.

We conclude that the trial court did not abuse its discretion in denying the defendant's motion for a new trial on grounds of juror misconduct. The defendant's claim that the jurors improperly considered the excluded evidence and defense counsel's objections thereto because of remarks made during the rebuttal argument is unsupported by the record. The letter did not refer to the rebuttal argument but alluded to events connected with exclusion of the evidence *at the time the evidence was offered.* We therefore conclude that the jurors' discussion was more than likely prompted by their own recollections of the proceeding, and not by anything that might have been said during the rebuttal argument.

Moreover, there is nothing in the letter or the record suggesting that the verdict was influenced by improper considerations. Although some jurors may have concluded that defense counsel was "hiding something," the "[m]ere expression of opinion, as opposed to positive expression of facts, does not warrant a mistrial." (Internal quotation marks omitted.) *State* v. *Anderson*, 255 Conn. 425, 438, 773 A.2d 287 (2001). Yuhas did not suggest that any juror had voted in favor of the plaintiff because he or she considered facts not in evidence or that the jurors had been improperly influenced by the rebuttal argument, nor did Yuhas himself express second thoughts about his vote in favor of the plaintiff. It is the defendant's burden to establish that the juror misconduct complained of caused her to suffer probable prejudice. *Speed* v. *DeLibero*, supra, 215 Conn. 313–14. This she has not done.

The defendant further claims that the jurors improperly speculated that the reports were unfavorable because of the disputed remarks made during the rebut-

tal argument. We have stated that "the rule that prohibits the examination of the jurors' mental process excludes, as immaterial, evidence as to the expressions and arguments of the jurors in their deliberations and evidence as to their own motives, beliefs, mistakes and mental operations generally, in arriving at their verdict. [C.] McCormick, Evidence (2d Ed.) § 68, p. 148." (Internal quotation marks omitted.) *Ginsberg* v. *Fusaro*, 225 Conn. 420, 429, 623 A.2d 1014 (1993); see also Practice Book § 16-34 ("[u]pon an inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror nor any evidence concerning mental processes by which the verdict was determined"). Thus, to the extent that the rebuttal argument may have caused the jury to reflect upon events surrounding exclusion of the reports, their reflections were part of the deliberative process and may not be considered by this court.

## III

The defendant's third claim is that the judgment should be reversed and a new trial ordered because at least three jurors failed to disclose their prior business relationships with the law firm of the plaintiff's counsel in violation of article first, § 19, of the Connecticut constitution, as amended by article four of the amendments,[12] a fact that came to light during the hearings on the defendant's posttrial motions. The defendant specifically claims that the trial court improperly denied her motion for disclosure to develop further informa-

---

[12] Article first, § 19, of the Connecticut constitution, as amended by article four of the amendments, provides in relevant part: "The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, to be established by law . . . . In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate. . . ."

tion regarding these relationships after they were discovered, and then improperly denied her motion for a new trial on similar grounds. We disagree.[13]

The disclosure issue was raised for the first time at the hearing on June 2, 2006, when counsel for the plaintiff told the court that she had learned after the verdict was rendered that her law firm had been involved in prior litigation against Yuhas and two other jurors. She added that none of the jurors had mentioned this to the court when counsel introduced themselves to the jury pool during voir dire.[14] Later in the hearing, defense counsel asked the court's permission to question the jurors about their relationships with the plaintiff's law firm. The court responded that it did not believe that the defendant had been disadvantaged by the situation that had come to light, given that the jurors had found in favor of the plaintiff.

On June 12, 2006, the defendant raised the issue again when she filed a supplemental motion in arrest of judgment alleging attorney misconduct based on the prior undisclosed business relationships of the plaintiff's law firm with an undetermined number of jurors. On that date, the defendant also filed a motion seeking disclosure by the plaintiff's law firm of all prior communications with the jurors. On June 20, 2006, the trial court discussed the matter at a hearing intended to address all of the defendant's posttrial motions.

---

[13] The plaintiff did not respond to this claim.

[14] The voir dire began on April 11, 2006. After a brief explanation by the court of the purpose of voir dire, counsel introduced themselves. The plaintiff's counsel gave her name, the name of her law firm, the names of the law firm's partners and the names of the individuals she intended to call as witnesses at trial. She specifically advised that if any prospective jurors knew, or recognized, any of the names, they should inform the court. Defense counsel did likewise. The court then instructed the prospective jurors that if anyone recognized the aforementioned names, they should inform the court. The court followed a similar procedure when voir dire continued the next day. None of the jurors responded.

At the hearing, the plaintiff's counsel stated that she recently had discovered her law firm's prior involvement in seven collection actions against Yuhas, none of which he had disclosed during the voir dire or at any other time during the proceedings. Counsel also informed the court that her law firm had been involved in actions against two other unnamed jurors. The court remarked that there was no indication in the record or in the Yuhas letter that the prior litigation had tainted the defendant's trial. The court further observed that, to the extent that there had been any prejudice, it most likely would have been directed toward the plaintiff because the plaintiff's law firm had been in a position adverse to the jurors in the prior unrelated proceedings. Following defense counsel's request for disclosure of the other jurors' names, the court observed that counsel for the parties had the opportunity to query the jurors during the voir dire and to ask them whether they had been sued by the plaintiff's law firm. Moreover, the record contained no evidence of juror prejudice that might have affected the decision. The court finally stated that, even if the jurors had disclosed their prior relationship with the plaintiff's law firm, that fact alone would not have been automatic grounds for recusal because counsel might well have decided that the jurors could remain impartial.

The court then denied the motion for disclosure on the grounds that the voir dire questioning had been open and robust and that law firms normally do not have a business relationship with the debtors they are suing, but with the parties they represent who are suing to collect on the debt. The court further noted that, insofar as defendants in such actions have a business relationship with attorneys in a lawsuit, their relationship is with the attorneys who represent them. Accordingly, it was not to be expected that the jurors would believe that they had ever had a business relationship

with the plaintiff's law firm. Defense counsel responded that the court was obligated to inquire further under *State* v. *Brown*, 235 Conn. 502, 526, 668 A.2d 1288 (1995) (court must conduct preliminary inquiry into allegations of jury misconduct in criminal cases), but the court stated that, because it had concluded that there had been no juror misconduct, it was not required to conduct any further inquiry. The court subsequently denied the defendant's supplemental motions in arrest of judgment and for a new trial.

## A

We begin with the defendant's motion for disclosure. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court." (Internal quotation marks omitted.) *Olson* v. *Accessory Controls & Equipment Corp.*, 254 Conn. 145, 156, 757 A.2d 14 (2000). The trial court's decision denying the motion for disclosure precluded the admission of evidence regarding prior communications between the law firm of the plaintiff's counsel and the jurors. A "trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . . Moreover, evidentiary rulings will be overturned on appeal only where there was . . . a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *Desrosiers* v. *Henne*, 283 Conn. 361, 365–66, 926 A.2d 1024 (2007).

We conclude that the trial court did not abuse its discretion in denying the motion for disclosure. The defendant's claim that Yuhas and the other jurors had

business relationships with the law firm of the plaintiff's counsel merely because the firm was involved in actions in which they were opposing parties stretches the concept of a business relationship beyond all reasonable bounds. We thus agree with the trial court that the only attorneys in the prior litigation with whom the jurors had a business relationship were the attorneys they hired to represent their interests.

Moreover, when the court gave the jurors opportunities to inform the court that they recognized the name of the law firm representing the plaintiff, the names of its partners and the name of the plaintiff's counsel, none of the jurors responded. It is therefore unlikely that any of the jurors recognized that the law firm of the plaintiff's counsel had represented their opponents in prior unrelated litigation.

Finally, even if the jurors had recognized the name of the law firm representing the plaintiff because of the prior litigation, any resulting prejudice most likely would have been directed to the plaintiff, rather than to the defendant, because the plaintiff's law firm had represented their opponents. As we stated in *Morgan* v. *St. Francis Hospital & Medical Center*, 216 Conn. 621, 626, 583 A.2d 630 (1990), "[t]o succeed on a claim of bias, the [complaining party] must raise his contention of bias from the realm of speculation to the realm of fact." (Internal quotation marks omitted.) The defendant provided no evidence that the jurors were influenced by, much less aware of, the fact that the law firm of the plaintiff's counsel had represented the plaintiffs in prior actions in which the jurors had been defendants. We therefore conclude that the trial court did not abuse its discretion in denying the defendant's motion for disclosure.

Insofar as the defendant argues that the trial court should have conducted a more comprehensive investi-

gation pursuant to *State* v. *Brown*, supra, 235 Conn. 526, in which we held that the trial court must conduct a preliminary inquiry into allegations of jury misconduct in criminal cases, we disagree. We note, first, that we declined in *Brown* to decide whether the same rule applies in civil cases. Id., 526 n.27. Nevertheless, assuming, without deciding, that the rule applies in civil cases, we stated in *Brown* that the form and scope of a preliminary inquiry are to be determined by the trial court within the exercise of its discretion. Id., 529. In the present case, the trial court permitted counsel for both sides to make lengthy arguments at the June 20 hearing before denying the motion for disclosure. We cannot say, in hindsight, and after considering the trial court's reasons for denying the motion, that the court abused its discretion in concluding that there was nothing to be gained by expanding the inquiry. Consequently, we reject the defendant's claim.

B

The defendant also claims that the trial court improperly denied the motion for a new trial and the supplemental motion in arrest of judgment on the ground of juror misconduct because the plaintiff's law firm had a prior undisclosed business relationship with the jurors. This claim is virtually identical to the claim raised by the defendant in her motion for disclosure. Accordingly, for all of the reasons described in part III A of this opinion, we conclude that the claim lacks merit.

IV

The defendant's fourth claim is that the trial court improperly admitted into evidence two documents offered by the plaintiff under the business records exception to the hearsay rule. The first document was a letter from the plaintiff to the defendant stating that the plaintiff had conducted a meter test at the defendant's residence on September 29, 1999, indicating that

the meter was accurate. The second document was a computer printout generated from the plaintiff's database containing similar information. The defendant claims that neither document should have been admitted into evidence because both involved multiple levels of hearsay and the witness whose testimony provided the foundation for their admission did not have sufficient personal knowledge of the plaintiff's computerized record keeping system to establish that they were business records.[15]

The plaintiff responds that the trial court properly admitted the documents under the business records exception to the hearsay rule because the witness was a longtime employee of the plaintiff with a thorough understanding of the plaintiff's record keeping procedures. We agree with the plaintiff.

In a letter dated October 7, 1999,[16] the plaintiff's customer service representative assigned to the case informed the defendant that the plaintiff had tested electric meter number 87550314, located at her residence, on September 29, 1999, and that the test had indicated a meter accuracy of 99.88 percent. The letter also informed the defendant that the test result was "well within the parameters established by the [department] for meter accuracy" and that the defendant should contact the plaintiff if she had any further questions. Thereafter, the plaintiff generated a computer printout for in-house use, entitled "order detail," containing all of the foregoing information plus certain

---

[15] The defendant specifically claims that: (1) the documents represented multiple levels of hearsay; (2) the witness who testified regarding the documents did not have sufficient personal knowledge to give testimony on the subject; (3) the business records exception cannot be used to identify the different levels of hearsay; and (4) the plaintiff did not establish a foundation for admitting the documents as hearsay or a foundation for the reliability of the computer process used in generating the computer printout.

[16] The letter was addressed to John C. Gilmore, the plaintiff's late husband, because his name had remained on the billing account.

additional information regarding the defendant's account and the meter test result.

At trial, Murphy testified that he was a supervisor in the plaintiff's credit and collection department and was responsible for a staff of approximately eighty-six persons. Murphy also testified that he had been employed by the plaintiff for eighteen years and was familiar with the plaintiff's customer service and billing procedures. After Murphy testified generally about customer service, the credit and collection department and the history of the billing dispute, the plaintiff's counsel attempted to offer the September 29 letter into evidence as a business record pursuant to General Statutes § 52-180.[17] The court excused the jury from the courtroom, and counsel conducted a voir dire of Murphy intended to provide a foundation for admission of the letter and the computer printout under the business records exception to the hearsay rule.

During the voir dire, Murphy testified regarding customer complaint procedures, explaining that, after the plaintiff issues an order to conduct a meter test, a tech-

___

[17] General Statutes § 52-180 provides in relevant part: "(a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter.

"(b) The writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of the evidence, but not to affect its admissibility. . . ."

Section 8-4 of the Connecticut Code of Evidence contains virtually identical language.

nician visits the location to conduct the test. The technician documents the test results by recording them manually in a handheld device, which transmits them electronically to the customer's account in the plaintiff's computerized database. The information is then printed out as a report for use by the customer service department. The customer service representative sends a form letter to the customer as soon as possible after the test explaining the test results.

Murphy testified that neither he nor the customer service representative had firsthand knowledge of the meter test in the present case because they had not tested the meter themselves and were not normally present when such tests were performed. He further testified that he did not have personal knowledge as to how the customer service representative had obtained the test result, although, on the basis of his personal knowledge of company operating procedures, he assumed that she had obtained it from the computer generated report. Murphy also testified that it was the plaintiff's customary practice, in the ordinary course of business, to send customers a letter informing them of the test results. He stated that a hard copy of such letters is retained in the plaintiff's files and that an electronic version and a general display of the test results is stored in the computerized database.

Murphy also testified that the computer printout was merely a copy of the order archived in the computerized system, which replicates the order received by the technician who performed the test and includes the test results. Murphy explained that he normally dealt with such documents in the regular course of his duties.

The trial court admitted the letter under the business records exception to the hearsay rule and under § 4-6[18]

---

[18] Section 4-6 of the Connecticut Code of Evidence provides: "Evidence of the habit of a person or the routine practice of an organization is admissible to prove that the conduct of the person or the organization on a particular occasion was in conformity with the habit or routine practice."

of the Connecticut Code of Evidence as part of the habit or custom of the corporation. The court also stated that it would be inclined to admit the computer printout if and when the plaintiff's counsel offered it into evidence. The court determined that both documents had been produced in the ordinary course of the plaintiff's business and that it was the plaintiff's regular business practice to send a letter and to produce a computer printout reflecting the status and disposition of a complaint within a reasonable period of time following a meter test. In response to defense counsel's objections that the documents contained multiple levels of hearsay, the court stated that the individual who actually had made or produced the letter need not testify and that further indicia that such letters were sent in the normal course of business was the computer printout verifying the fact that the test had been conducted.

After the jury returned to the courtroom, the plaintiff's counsel continued her direct examination of Murphy, who repeated his prior testimony at the hearing. The court ultimately admitted both documents, over defense counsel's objections, under the business records exception to the hearsay rule. The defendant subsequently cited improper admission of the letter as one of several grounds for granting the motion for a new trial. The motion made no claim with regard to the computer printout.

"It is axiomatic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [General Statutes §] 52-180[19] sets forth an exception to the evidentiary rule otherwise barring admission of hearsay evidence[20]

[19] See footnote 17 of this opinion.

[20] "[H]earsay is an out-of-court statement offered into evidence to establish the truth of the matters contained therein. . . . In the absence of personal knowledge about the contents of a document, a witness' statements about

for business records that satisfy express criteria. . . .
The rationale for the exception derives from the inherent trustworthiness of records on which businesses rely to conduct their daily affairs. . . .

"To be admissible under the business record exception to the hearsay rule, a trial court judge must find that the record satisfies each of the three conditions set forth in . . . § 52-180. The court must determine, before concluding that it is admissible, that the record was made in the regular course of business, that it was the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter. . . . In applying the business records exception . . . [§ 52-180] should be liberally interpreted." (Citations omitted; internal quotation marks omitted.) *Margolin* v. *Kleban & Samor, P.C.*, 275 Conn. 765, 779–80, 882 A.2d 653 (2005).

In *American Oil Co.* v. *Valenti*, 179 Conn. 349, 350–55, 426 A.2d 305 (1979), the defendant, the principal debtor on a promissory note and contract of guarantee, contested the admissibility of computer printouts summarizing the state of his accounts. In admitting the printouts, the trial court relied on the testimony of the plaintiff's sales manager, who supervised the defendant's account and whose knowledge of computer processing was derived from his monthly receipt of computer printouts and from working with other employees directly responsible for credit and computer procedures. Id., 357. The sales manager did not participate personally in preparing the statements or use a computer himself. Id.

We concluded in *American Oil Co.* that the plaintiff had provided an adequate foundation for admitting the

---

the document are hearsay." (Citation omitted; internal quotation marks omitted.) *New England Savings Bank* v. *Bedford Realty Corp.*, 238 Conn. 745, 757, 680 A.2d 301 (1996).

printouts, reasoning that a person without detailed knowledge of computers who uses computer records and has only an indirect role in their production is competent to testify that the records were made in the ordinary course of business, and that the witness' personal knowledge regarding production of the documents is a question that goes to the weight of the evidence only. Id., 357–58. "While a witness from the computer department may well be the optimal proponent of such evidence, such a person may not always be available to testify. What is crucial is not the witness' job description but rather his [knowledge] about the basic elements that afford reliability to computer printouts. . . . The witness must be a person who is familiar with computerized records not only as a user but also as someone with some working acquaintance with the methods by which such records are made." (Citation omitted.) Id., 360–61.

Guided by the foregoing principles, we conclude that the trial court properly determined that Murphy was competent to testify that the computer printout and the letter, which included information transferred electronically from the technician in the field to the plaintiff's in-house database, had been made in the ordinary course of the plaintiff's business, that similar documents were generated in the course of the plaintiff's business and that the documents had been created within a reasonable time following the inspection of the defendant's residence. Murphy's testimony provided an adequate foundation for admission of the documents because, as an eighteen year employee of the plaintiff and a supervisor of credit and collection, he had demonstrated extensive personal knowledge of the plaintiff's billing procedures, the procedures established to collect on past due accounts and the electronic and computerized systems used to maintain and update information regarding such matters. Moreover,

although he had not been present when the technician visited the defendant's residence and entered the meter test results into the handheld device, Murphy had gone to the defendant's residence on at least two occasions to investigate electricity consumption and the accuracy of the meters themselves, and thus was acquainted with the actual meters that had produced the information recorded by the technician. We therefore conclude that the trial court did not abuse its discretion in admitting the letter and the computer printout into evidence under the business records exception to the hearsay rule.

V

The defendant's fifth claim is that the trial court improperly instructed the jury that it could not consider the fact that, for a period of several years, the plaintiff had charged the defendant the incorrect rate for her electric service and that the bills were not illegal or inaccurate. The defendant claims that the instruction was improper because, when considered in the context of the jury charge as a whole, the instruction, in effect, directed a verdict for the plaintiff. The plaintiff responds that the incorrect rate to which the court referred was the rate charged for electric heat, which is lower than the standard rate charged to customers with nonelectric heat. Accordingly, because the defendant's residence was heated by oil, the defendant benefited from the lower rate and the trial court's instructions were not improper. We agree with the plaintiff.

Defense counsel first referred to the rate charged for the defendant's electric service in his opening statement, when he declared that the defendant's electric utility bills, which approached $1000 per month during the 1990s, had been unreasonable. In his statement, he also asserted that consumers have a right to adequate service at a reasonable rate, that the defendant had complained for years that her electric bills were too

high and that the plaintiff's response was that her bills were high because she had an "electric house." He explained that the term "electric house" refers to a house heated by electricity and that the plaintiff mistakenly had charged the defendant the electric rate normally charged to customers with electric heat rather than the standard rate charged to customers with oil heat. He then stated that, if the plaintiff had made a mistake by charging the defendant the incorrect electric rate, it could have made other mistakes in calculating her electric bills.

Murphy later testified that the plaintiff incorrectly had charged the defendant the electric rate between 1992 and 1996, even though the primary source of heating for her home was oil. He also testified that the electric rate charged had been lower than the standard rate, but that the plaintiff had not imposed any retroactive charges on the defendant after the mistake was discovered to compensate for the benefit that she had received during those years.

Thereafter, the court instructed the jury that the plaintiff's contract with the defendant required the plaintiff to provide electric power to the defendant at a rate applicable to residential customers and approved by the department. The court continued: "[H]ere the evidence establishes that the rate charged per kilowatt was that established by the [department]. While the evidence established that at one time 11 Harding Lane was charged at a rate reflecting a house with electric heat rather than oil heat, the uncontradicted testimony is that the rate applicable to a home with electric heat was lower than that . . . for the home or a residence heated with oil and, therefore, you would not consider that . . . on any issue in this case. The plaintiff claims that electric services were provided to 11 Harding Lane and that the defendant . . . has not paid for those services. The plaintiff, therefore, claims . . . that it is enti-

tled to recover a sum of money based on the allegations in the complaint. And that sum . . . is $45,072.45.''

Following the jury charge, defense counsel objected to the instruction regarding the rate charged to the defendant, arguing that testimony on the lower rate had been given by the plaintiff's witness and was not necessarily true. Accordingly, the jury might reject it. The court replied that it merely had instructed that the testimony was uncontradicted, not that it was true. Defense counsel countered that the instruction prevented the jury from inferring that, if the rate charged to the defendant had been wrong, the meter test could have been wrong. Defense counsel repeated its argument at the June 20 hearing on the motion for a new trial, stating that it was important for the jury to consider that the improper rate had been charged because it demonstrated that the plaintiff was capable of making mistakes not only with respect to rates, but also with respect to meter tests. The defendant reiterated the claim in her motion for a new trial.

"When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Failure to charge precisely as proposed by a defendant is not error where the point is fairly covered in the charge. . . . Instructions are adequate if they give the jury a clear understanding of the issues and proper guidance in

determining those issues." (Internal quotation marks omitted.) *Allison* v. *Manetta*, 284 Conn. 389, 395–96, 933 A.2d 1197 (2007).

We conclude that the trial court's instructions to the jury were not improper. In instructing that the jury must not consider the electric rate charged to the defendant in relation to other issues, the court was not stating that the defendant's utility bills were not illegal or inaccurate but simply was pointing out that Murphy's testimony that the rate charged for electric heat is lower than the standard rate was uncontradicted and that the actual rate charged to the defendant should not affect the jury's consideration of other issues relating to the defendant's utility bill. Accordingly, we conclude that the instruction was not incorrect in the law, was adapted to the issues and was sufficient for the guidance of the jury.

## VI

The defendant's sixth claim is that the trial court improperly awarded the plaintiff offer of judgment interest pursuant to General Statutes § 52-192a.[21] The

[21] General Statutes (Rev. to 2003) § 52-192a provides in relevant part: "(a) After commencement of any civil action based upon contract or seeking the recovery of money damages, whether or not other relief is sought, the plaintiff may, not later than thirty days before trial, file with the clerk of the court a written 'offer of judgment' signed by the plaintiff or the plaintiff's attorney . . . offering to settle the claim underlying the action and to stipulate to a judgment for a sum certain. The plaintiff shall give notice of the offer of settlement to the defendant's attorney . . . . Within sixty days after being notified of the filing of the 'offer of judgment' and prior to the rendering of a verdict by the jury or an award by the court, the defendant or the defendant's attorney may file with the clerk of the court a written 'acceptance of offer of judgment' agreeing to a stipulation for judgment as contained in plaintiff's 'offer of judgment'. . . .

"(b) After trial the court shall examine the record to determine whether the plaintiff made an 'offer of judgment' which the defendant failed to accept. If the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain stated in the plaintiff's 'offer of judgment', the court shall add to the amount so recovered twelve per cent annual interest on said amount . . . . In those actions commenced

defendant claims that the award was improper because the plaintiff addressed the offer of judgment only to the "defendant" when there were four defendants in the case at the time, thus making it unclear as to whom the offer was directed. The defendant contends that unless an offer of judgment identifies a defendant by name or a unified offer is made to "all defendants," a presumption in favor of the plaintiff should not be permitted. The plaintiff responds that the defendant was clearly served with notice of the offer of judgment as required under the applicable rules of practice[22] and, therefore, the trial court properly awarded the plaintiff offer of judgment interest. We decline to review this claim because it was inadequately briefed.

on or after October 1, 1981, the interest shall be computed from the date the complaint in the civil action was filed with the court if the 'offer of judgment' was filed not later than eighteen months from the filing of such complaint. If such offer was filed later than eighteen months from the date of filing of the complaint, the interest shall be computed from the date the 'offer of judgment' was filed. The court may award reasonable attorney's fees in an amount not to exceed three hundred fifty dollars, and shall render judgment accordingly. . . ."

[22] Practice Book (2004) § 17-14 provides: "After commencement of any civil action based upon contract or seeking the recovery of money damages, whether or not other relief is sought, the plaintiff may, not later than thirty days before the commencement of jury selection in a jury trial or the commencement of evidence in a court trial, file with the clerk of the court a written 'offer of judgment' signed by the plaintiff or the plaintiffs attorney, directed to the defendant or the defendant's attorney, offering to settle the claim underlying such action and to stipulate to a judgment for a sum certain. The plaintiff shall give notice of such offer of settlement to the defendant's attorney, or if the defendant is not represented by an attorney, to the defendant."

Practice Book (2004) § 17-18 provides in relevant part: "After trial the judicial authority shall examine the record to determine whether the plaintiff made an 'offer of judgment' which the defendant failed to accept. If the judicial authority ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain stated in that plaintiff's 'offer of judgment,' the judicial authority shall add to the amount so recovered 12 percent annual interest on said amount, computed as provided in General Statutes § 52-192a, may award reasonable attorney's fees in an amount not to exceed $350, and shall render judgment accordingly. . . ."

On July 8, 2004, the plaintiff filed an offer of judgment stating in relevant part: "Pursuant to [General Statutes] § 52-192a . . . and Practice Book § 17-14 . . . [the] plaintiff hereby offers to take judgment of the defendant in the above-captioned matter in the amount of [t]wenty-eight [t]housand [d]ollars ($28,000), and to stipulate to judgment for that sum.

"This offer is open for sixty (60) days from the date of this offer. Should the defendant fail to accept this offer within such sixty (60) day period, and the plaintiff subsequently recovers after trial an amount equal to or greater than the above sum, then the plaintiff shall be awarded by the [c]ourt twelve percent (12%) interest per annum and may award the plaintiff $350 for attorney's fees." All four defendants were named in the caption. Counsel for the plaintiff certified that the offer was mailed to Douglas Gilmore, the "attorney for defendants."

None of the defendants accepted the offer within sixty days. On April 27, 2006, the plaintiff filed a post-judgment motion for offer of judgment interest and attorney's fees pursuant to § 52-192a.[23]

Following a hearing on June 20, 2006, the trial court granted the motion. The court noted that in *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 239 Conn. 708, 687 A.2d 506 (1997), and *Willow Springs*

---

[23] The motion stated in relevant part: "Plaintiff served an offer of judgment on the defendants by date of July 8, 2004—within eighteen months following the commencement of this action—offering to resolve this dispute by the payment of $28,000, and stipulate to judgment in said amount. Defendants rejected this offer by failing to accept it. Now a verdict has entered in favor of the plaintiff in an amount greater than the offer of judgment amount.

"[General Statutes] § 52-192a expressly provides that [the] plaintiff is entitled to an award of 12 [percent] interest on the amount of the judgment, and . . . reasonable attorney's fees in an amount not to exceed $350.

"WHEREFORE, [the] plaintiff prays that this [c]ourt award [the] plaintiff 12 [percent] annual interest and attorney's fees of $350 [in] favor [of the] plaintiff."

*Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 717 A.2d 77 (1998), this court had concluded that § 52-192a should be construed liberally and applied so as to effectuate the public policy of encouraging settlements and allowing the defendant the opportunity to accept an offer of judgment. Therefore, in light of this court's construction of the statute in those cases, and because the defendant in the present case had been given the opportunity to accept the offer of judgment at the time that it was filed, the offer of judgment was valid. The court awarded the plaintiff interest in the amount of $14,623.67 and costs of $756.20, for a total award of $60,452.81.

"We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned." (Internal quotation marks omitted.) *State* v. *T.R.D.*, 286 Conn. 191, 213–14 n.18, 942 A.2d 1000 (2008).

In the present case, the defendant devotes little more than a page of her original and reply briefs combined to the discussion of her claim, limiting her argument to the bare assertion that she should not be held legally liable for offer of judgment interest because she was not specifically named in the offer and no unified offer was made to all four defendants.[24] The only case on

---

[24] Judge Blue, citing *Ward* v. *Greene*, 267 Conn. 539, 546, 839 A.2d 1259 (2004), states that the defendant's brief "falls short of professional standards," yet he concludes that this court should exercise its discretion in favor of reviewing the defendant's claim. *Ward*, however, is inapposite. In that case, in which the defendant argued that the plaintiff's claim should not be reviewed because it had not been adequately briefed, we decided nonetheless to review it after noting that, although the plaintiff had "failed

which she relies is *Butts* v. *Francis*, 4 Conn. 424 (1822),[25] in which the court concluded that, where two or more persons are sued on a joint contract, service must be made, if not by personal summons, then by leaving an attested copy with each of the defendants or at the usual place of abode. Id., 426. As it is patently obvious that the issue in *Butts* is entirely unrelated to the issue on appeal, we deem the defendant's claim abandoned and decline to review it.[26] See *State* v. *Greene*, 274 Conn.

to analyze *in depth* the issues presented"; (emphasis added) id.; the issues had been analyzed in sufficient degree to merit our attention. In contrast, the issue in the present case has not been adequately briefed. Accordingly, the circumstances in *Ward* were entirely different from those in the present case and provide no basis for reviewing the defendant's claim.

[25] In her reply brief, the defendant also cites *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, supra, 239 Conn. 743, for the proposition that a unified offer of judgment to all defendants is consistent with the purposes of § 52-192a, but then states that "[t]his has nothing to do with our case . . . ."

[26] We disagree with Judge Blue that, despite the defendant's inartful drafting of the claim, the issue should be reviewed for the same reasons that we review statutory claims falling under the plain error doctrine. "[T]he plain error doctrine, which is now codified at Practice Book § 60-5 . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . Implicit in this very demanding standard is the notion, expressed previously, that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review." (Internal quotation marks omitted.) *State* v. *Simpson*, 286 Conn. 634, 647–48 n.16, 945 A.2d 449 (2008). This is not such an occasion.

Moreover, it is well established that this court will not apply the plain error doctrine when it has not been requested affirmatively by a party, as in this case. *Johnson* v. *Commissioner of Correction*, 288 Conn. 53, 60, 951 A.2d 520 (2008) (declining to consider unpreserved claim under plain error doctrine because petitioner failed to request that court undertake such review); *State* v. *Britton*, 283 Conn. 598, 617, 929 A.2d 312 (2007) (declining

134, 173–74 n.28, 874 A.2d 750 (2005) (where parties cite no law and provide no analysis of claims, we do not review them), cert. denied, 548 U.S. 926, 126 S. Ct. 2981, 165 L. Ed. 2d 988 (2006); *State* v. *Colon*, 272 Conn. 106, 153 n.19, 864 A.2d 666 (2004) (claim deemed abandoned for failure to brief properly), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

## VII

The defendant's final claim is that the trial court improperly denied her motion in limine to exclude from evidence all references to department proceedings. The defendant specifically claims that the denial of her motion resulted in a violation of her constitutional rights to due process, to a trial by jury, to access to the courts and to present a defense[27] because, even though the court ultimately deemed the department's decision inadmissible, the jury could have concluded from numerous other references to department proceedings throughout the trial that the department had ruled against her. We disagree.[28]

On April 17, 2006, the defendant filed a motion in limine seeking to preclude all references to, or admission of, evidence regarding department proceedings. The defendant claimed that, if the jurors heard testimony that the department had considered her com-

___

invitation to apply plain error doctrine because party failed to explain why claim merited such extraordinary remedy). Accordingly, the plain error doctrine has no relevance in the present context, even by analogy.

[27] The defendant also argues that the department regulation providing that a customer "shall agree to abide by the results of [a requested meter test] as the basis for any adjustment of disputed charges," although a collateral matter, makes reference to the proceedings at trial more "cruel," and an additional ground on which to find the trial court's failure to grant the motion in limine a denial of due process and the right to a trial by jury. We decline to consider this claim because the department report was deemed inadmissible by the court.

[28] The plaintiff made no response to this claim.

plaint, they would conclude that the department had ruled against her because it is common knowledge that a regulatory agency has unsurpassed expertise in matters over which it exercises authority. On April 18, 2006, the court held a hearing on the motion. Defense counsel argued that the department's decision should not be admitted because it would allow the jurors to hear the department's view on the ultimate issue before the court, namely, the validity of the defendant's electric utility bills.[29] The plaintiff's counsel responded that evidence of the proceedings should be admitted to explain the history of the case and to show that the plaintiff had acted in good faith and exhausted all means of assisting the defendant. The court stated that it would be difficult to rule on the relevance and probative value of the department proceedings in light of the evidentiary vacuum existing at that time. It therefore denied the motion without prejudice so as to give the defendant an opportunity to raise the issue again if the report or any part thereof was offered in the plaintiff's case-in-chief or for purposes of refuting any remaining issues in her counterclaim. At trial, the court ultimately precluded admission of the department report and all testimony regarding its conclusion, but, over defense counsel's numerous objections, permitted testimony regarding the underlying investigation.

Our standard of review is well established. "A trial court may entertain a motion in limine made by either party regarding the admission or exclusion of anticipated evidence. . . . The judicial authority may grant the relief sought in the motion or other relief as it may deem appropriate, may deny the motion with or without

---

[29] The defendant also argued that, because of defects in department regulations pertaining to the resolution of disputes, the governing regulations were constitutionally flawed. We do not address this issue, however, because neither the department report nor its conclusions were entered into evidence or considered by the jury.

prejudice to its later renewal, or may reserve decision thereon until a later time in the proceeding. Practice Book § 42-15.[30] . . . [T]he motion in limine . . . has generally been used in Connecticut courts to invoke a trial judge's inherent discretionary powers to control proceedings, exclude evidence, and prevent occurrences that might unnecessarily prejudice the right of any party to a fair trial. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did. . . . Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . Finally, the standard in a civil case for determining whether an improper ruling was harmful is whether the . . . ruling [likely affected] the result. . . . Despite this deferential standard, the trial court's discretion is not absolute. Provided the defendant demonstrates that substantial prejudice or injustice resulted, evidentiary rulings will be overturned on appeal [when] the record reveals that the trial court could not reasonably conclude as it did." (Citations

---

[30] Practice Book § 42-15 provides: "The judicial authority to whom a matter has been referred for trial may in its discretion entertain a motion in limine made by either party regarding the admission or exclusion of anticipated evidence. Such motion shall be in writing and shall describe the anticipated evidence and the prejudice which may result therefrom. The judicial authority may grant the relief sought in the motion or such other relief as it may deem appropriate, may deny the motion with or without prejudice to its later renewal, or may reserve decision thereon until a later time in the proceeding."

omitted; internal quotation marks omitted.) *Carlson* v. *Waterbury Hospital,* 280 Conn. 125, 140–41, 905 A.2d 654 (2006).

We conclude that the trial court's ruling was not improper. The court denied the motion in limine without prejudice because it could not determine, without additional context, whether evidence regarding department proceedings would be prejudicial to the defendant. The defendant thus was permitted to raise objections at a more appropriate time during the proceedings when the record was further developed and the court would be in a better position to evaluate the relevance and probative value of the proffered evidence.

We also conclude that the trial court's subsequent rulings admitting evidence of the underlying department investigation, but excluding the department report, were not improper. The gravamen of the defendant's claim was that evidence concerning the investigation and the report, and defense counsel's repeated objections thereto, indirectly communicated to the jurors that the department had ruled against her. We disagree. The testimony regarding the underlying proceedings was necessary to explain the history of the case, and the court did not allow testimony regarding the conclusions reached by the review officer or the department. To the extent that defense counsel's objections may have suggested that the department had ruled against the defendant, the trial court instructed the jury that counsel was entitled to object to evidence it believed to be improper under the rules of evidence and that objections should not influence the jurors or be held against the attorney or the client. See part I of this opinion. The court also instructed that the jury could consider only those documents entered into evidence. "It is reasonable to presume that jurors will adhere to the court's instructions." *State* v. *McCall,* 187

Conn. 73, 80, 444 A.2d 896 (1982). Accordingly, we cannot conclude the trial court's ruling constituted an abuse of its broad discretion.

The judgment is affirmed.

In this opinion NORCOTT, KATZ and PALMER, Js., concurred.

BLUE, J., concurring and dissenting. I fully agree with parts I, II, III, IV, V and VII of the very thorough opinion of the majority. It is my misfortune that I cannot agree with part VI.

The dispositive facts are set forth in the record. The plaintiff, Connecticut Light and Power Company, brought this action against four defendants—Bess P. Gilmore, Douglas G. Gilmore, Keith P. Gilmore and Community Club Awards, Inc. On July 8, 2004, the plaintiff filed a document infelicitously entitled "Offer To Judgment."[1] The caption of the offer names all four defendants. The text of the offer is as follows:

"Pursuant to [General Statutes] § 52-192a . . . and Practice Book § 17-14 . . . [the] plaintiff hereby offers to take judgment of the defendant in the above-captioned matter in the amount of [t]wenty-eight [t]housand [d]ollars ($28,000), and to stipulate to judgment for that sum.

"This offer is open for sixty (60) days from the date of this offer. Should the defendant fail to accept this offer within such sixty (60) day period, and the plaintiff subsequently recovers after trial an amount equal to or

---

[1] The title was plainly a scrivener's error for "offer of judgment," the accepted nomenclature for offers pursuant to General Statutes (Rev. to 2003) § 52-192a (a) at the time of the offer here. Since 2005, offers of this description have been referred to as "offers of compromise." Public Acts 2005, No. 05-275. Because the operative facts here occurred in 2004, the more traditional term "offer of judgment" will be employed.

greater than the above sum, then the plaintiff shall be awarded by the [c]ourt twelve percent (12%) interest per annum and may award the plaintiff $350 for attorney's fees."

No defendant accepted the offer. The plaintiff subsequently withdrew its action against the defendants Douglas G. Gilmore, Keith P. Gilmore and Community Club Awards, Inc. On April 26, 2006, the jury returned a verdict for the plaintiff against the remaining defendant, Bess Gilmore (Gilmore), in the amount of $45,072.94.

The plaintiff filed a postjudgment motion for offer of judgment interest and attorney's fees. Gilmore filed a timely objection, arguing that the plaintiff had "failed to address its offer of judgment to any specific 'defendant . . . .' " The trial court squarely considered the issue presented, stating that the offer of judgment referred "only to an individual defendant in this case rather than to all defendants." It concluded that, although "[i]t would have been easier and would have clearly indicated the global nature of the offer had the [word] been defendants," the court was "constrained" by law to grant the plaintiff's motion.

The majority deems Gilmore's claim to have been abandoned on appeal and declines to review it. I respectfully disagree. Although neither party has distinguished itself in the art of legal drafting, the issue is fairly presented by the record. The issue was presented to the trial court in the form of a timely objection. The trial court squarely considered and decided the issue. However clumsily, Gilmore has brought this issue to our attention on appeal.[2]

Gilmore's brief contains an inapt citation and falls short of professional standards. The issue nevertheless

---

[2] Gilmore's brief states that "[t]he defendant was never made an offer of judgment, as the offer of judgment was made only to the 'defendant' as to four defendants, and there was no unified offer of judgment."

involves the interpretation of a statute that confronts trial judges (including the trial judge here) on a regular basis. The majority's decision not to review a claim on the basis of inadequate briefing is discretionary in nature. *Ward* v. *Greene*, 267 Conn. 539, 546, 839 A.2d 1259 (2004). When the issue involves the plain language of an important statute, our discretion should be exercised in favor of review. Id.

This is analogous to our practice in reviewing statutory claims falling under the plain error doctrine. Practice Book § 60-5.[3] Offer of judgment interest is a creature of statute and cannot be awarded unless it is supported by an examination of "the record." General Statutes § 52-192a (c). We can thus decide the issue by examining the record and construing the statute, over which our review is plenary. "Plain error review is . . . appropriate in matters involving statutory construction because 'the interpretation of [a] statute and the resolution of [the] issue does not require further fact finding. . . .' *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 39, 699 A.2d 101 (1997) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Velasco*, 253 Conn. 210, 219 n.9, 751 A.2d 800 (2000). This case, like *Velasco*, "presents a 'strictly legal question that requires no finding of facts.' *Sicaras* v. *Hartford*, 44 Conn. App. 771, 786, 692 A.2d 1290, cert. denied, 241 Conn. 916, 696 A.2d 340 (1997) . . . ." (Citation omitted.) *State* v. *Velasco*, supra, 219 n.9. Under these circumstances, neither party would be prejudiced by our review of the

---

[3] I agree with footnote 26 of the majority opinion that the plain error doctrine is a rule of reversibility rather than reviewability. For reasons stated in the text, the claim in question has sufficiently been claimed both in the trial court and on appeal to be reviewable. Because the trial court's ruling was demonstrably wrong, it is also reversible. The "reversible rather than reviewable" doctrine means that the plain error rule will not be applied "to review a ruling that is not even arguably incorrect in the first place." *State* v. *Cobb*, 251 Conn. 285, 343 n.34, 743 A.2d 1 (1999), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). That is simply not the situation here.

underlying claim. Because the claim is presented by the record, because the trial court squarely considered it and because resolution of the claim would be of assistance to trial courts, struggling—like the trial court here—to interpret § 52-192a (c), we should not decline to review it.

A consideration of the merits must begin with this court's seminal decision in *Blakeslee Arpaia Chapman, Inc.* v. *EI Constructors, Inc.*, 239 Conn. 708, 687 A.2d 506 (1997) (*Blakeslee*). *Blakeslee* holds that, in a case involving multiple defendants, "it is within the plaintiff's discretion whether to file a unified offer of judgment against multiple defendants or to file a separate offer of judgment against each defendant." Id., 743. *Blakeslee* establishes that a plaintiff wishing to make an offer of judgment in a case involving multiple defendants must proceed down one of two specified procedural avenues: (1) file a unified offer of judgment against all of the defendants; or (2) file a separate offer of judgment against each defendant. Id. The plaintiff here did neither.

There are four defendants listed in the caption of the offer of judgment. The offer is made to "the defendant." Under these circumstances, the trial court could not determine, pursuant to § 52-192a (c), that the plaintiff had made a statutorily valid offer of judgment to any particular defendant.

To decide whether there has been a valid offer of judgment, courts apply the principles of contract law. See *Radecki* v. *Amoco Oil Co.*, 858 F.2d 397, 400 (8th Cir. 1988), and authorities cited therein. "The law governing the construction of contracts is well settled. . . . Where the language is ambiguous . . . we must construe those ambiguities against the drafter." (Citation omitted; internal quotation marks omitted.) *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 13–14, 938 A.2d 576 (2008). Because the plaintiff drafted the

offer of judgment in question, any ambiguity in the offer must be construed against the plaintiff.

Substantive contract law is instructive on the issue presented. The analogy that comes to mind is the famous case of *Raffles* v. *Wichelhaus*, 159 Eng. Rep. 375 (Ex. 1864). The defendant in *Raffles* offered to buy 125 bales of cotton "to arrive ex 'Peerless' from Bombay." Unhappily for the parties, but happily for future generations of law professors, there were two ships called the "Peerless" sailing from Bombay at different times. Because the contract failed to show which particular ship called the "Peerless" was meant, it had a latent ambiguity, and under the circumstances, the ambiguity was fatal to the validity of the contract. Similarly, in the present case, there were four parties called "the defendant." The ambiguity as to which particular party called "the defendant" was designated by the offer is fatal to the validity of the offer.

The difficulty here is, if anything, greater than in the somewhat more conventional contract problem considered in *Raffles*. In *Raffles*, the offeree would have been free to reject the offer without running the risk of incurring liability as a result. A party who receives an offer of judgment, however, is in a different position because the offer has a binding effect when *declined* as well as when accepted. This results from the penalty provision of § 52-192a (c), which becomes operative if "the defendant failed to accept." Thus, even more than in the *Raffles* scenario, the recipient of an offer of judgment "needs to have a clear understanding of the terms of the offer in order to make an informed decision whether to accept it." *Radecki* v. *Amoco Oil Co.*, supra, 858 F.2d 403.

In contract cases involving *agreement*, courts try to effectuate the agreement of the parties. Thus, in the *Raffles* scenario (which involved an acceptance as well

as an offer), if both parties intend the same ship Peerless, there is a contract notwithstanding the latent ambiguity. 1 Restatement (Second), Contracts § 20, illustration (1), p. 60 (1981). Where an offer is *not* accepted, however, there is no agreement to enforce.

Section 52-192a (c) requires the trial court to "examine the *record* to determine whether the plaintiff made an offer of [judgment] which the defendant failed to accept." (Emphasis added.) The statutory requirement of an examination of "the record" makes it clear that the legislature intended to give the court a ministerial task. In a *Raffles*-like contract case of offer and acceptance, the court would hold an evidentiary hearing to determine whether the parties did or did not intend the same ship Peerless. Such an inquiry would not be appropriate in a § 52-192a (c) proceeding, where the court is statutorily limited to "the record." If the offer of judgment is patently ambiguous, the court cannot enforce it.

The offer of judgment here was patently ambiguous with respect to "the defendant" designated in the offer. In the absence of a "clear baseline"; *Gavoni* v. *Dobbs House, Inc.*, 164 F.3d 1071, 1076 (7th Cir. 1999); there was no valid offer for the trial court to enforce pursuant to § 52-192a (c).

I would reverse on this issue.